Good morning. Welcome to the 11th Circuit. I think you're all familiar with our timing system, but just a quick reminder, when the yellow light goes on, you have two minutes left for your argument. When the red light goes on, you're done. If we ask you some questions that take you over that time limit, please do answer the questions. We wouldn't be asking them if we didn't want to hear your answers to them. And with that, we're going to go ahead and get started with our first case of the day today, United States of America versus Peter Tarantino. Good morning, Your Honor. Good day to you, Your Court. I'm Alex Edel on behalf of Todd and Julie Chrisley. We've split the argument with co-defendants to 11 minutes and 4 minutes. I'd like to ask for 7 minutes now and 4 minutes on rebuttal if the Court's okay with that. Your Honor, the defendant makes a Giglio claim post-trial that relies on information and activities outside the record. This Court has held for decades, but the District Court is required to hold a hearing on those accusations if they could lead to a new trial and relief for the defendants. Here, the Giglio claims would have that effect for a few particular reasons. First, the issue that was discussed that came out in the redirect and then the recross of Officer Betty Carter was whether the Chrisleys had paid taxes in the post-conspiracy period. And the District Court below confirmed that that would have a potential prejudicial effect on the defendants by leading the jury to believe that they had not paid their taxes, that they weren't interested in paying taxes, that they were untruthful, and essentially that they were the type of person who could commit fraud, charge, or the other acts. That effect spills over not just to the tax charges, but to all of the fraud charges in this case. But there's an additional effect that is brought out in our motion for reconsideration on that Giglio motion, which is that the evidence suggested that the prosecutors here worked in concert with the witness to testify in a manner... What is the evidence that suggested that? So you have, I think, 11 pages in Document 304 that lay out things both from the affidavit and from the trial record that show that the prosecutors here believe that as long as their witness was relying on the EUP, a technically correct document, but one that they recognized was misleading, that testimony would be, in the words of the prosecutors, true and correct. So we have both the records that show when Officer Carter was looking at records, we have the prosecutor's own words to the district court at multiple times, both before trial, during trial, and in the post-trial proceedings. They specifically argued to the court that it was true and correct because of the EUP. They say at one point that they are relying on the EUP and that they relied on the EUP at trial. If they relied on the EUP at trial, that means they relied on information they knew to be misleading. And if that were the At some point, the office recognized that its prosecutors had told a witness, you can testify this way because we know the IRS system says that. We also know it's incorrect, but so long as you say it that way, we think it's okay. If that disclosure had been made to the defense team, they could have used that to undermine everything that Betty Carter said, but also to undermine... Well, let's talk about that for a moment, right? Because even if we assume the facts as you are suggesting them to be, isn't it the case that your clients were continuing to pay, maybe not for 2014 and 2015, but for the other years, I guess it was 2010, 2011, 2016, whatever, as late as September of 2022? No. Where would I find that in the record? So in our original motions, both the original motion for new trial and 304, that make clear that the testimony of Mr. Seckendorf in his affidavit was that before trial, the Chrisleys had no outstanding tax liability, and the only tax liability, sorry, the only thing owing back and forth would have been a credit to the Chrisleys. And this is why you have a hearing, because the district court made what she declared to be findings on no record with no ability for us to cross-examine, that misstated the fact that the Chrisleys had paid all those taxes. And so I don't think this court can rely on the idea that the district court relied upon. They paid some years. They didn't pay ever. They didn't pay others. Seckendorf was clear. They had paid everything before trial. In fact, the government doesn't argue they hadn't paid 2009 and 2010. They tell the court that we somehow conceded 2016, which is not at all what Bruce Seckendorf's declaration says whatsoever. So the testimony that we would have elicited at that hearing was there was no taxes owing at the time of trial, and that would have been clear from the payments that Betty Carter looked at in the system. But the spillover there goes to, all right, the prosecutors know there's nothing due. We know that from the motion to eliminate. They know this issue is coming because it's one of the defenses that the defense lawyers are going to raise. They file a motion to eliminate to try to exclude that testimony, and the court says, no, I think it's relevant. We're going to let it in. And so then instead of letting that testimony come in cleanly, they take this approach where Betty Carter testifies to what the EUP says. But didn't this testimony first come out on cross-examination when defense counsel solicited it? Of course. And in all sorts of things, as a prosecutor, you would not ask a witness, but you would know that that witness is going to talk about. And not only did it come out – I mean, I think there's – it's not a defense to a Giglio claim to say, I can tell a witness to lie. Of course not. Of course not. But in conjunction with whatever evidence there might be about whether this was actually a coordinated effort or whether instead this is speculation on the part of the defendants, it is relevant, right? I mean, it's a little bit relevant. Well, sure. And I don't want to interrupt, but I will say, in redirect, he comes back to it. AUSA CREP immediately comes back and asks a series of questions. We cite that a few times in our brief. And he asks – he says, you know, Ms. Carter, I want to let you talk about those records. And she says, oh, yes, I went back and I looked just the other day. There's a balance owing and due. That's not true. All right. So let me just ask you something. That is a general question. I've looked at that testimony because I was concerned. And the question that's asked is about whether there is tax owing and due or any amounts owing and due. And the answer is yes. And so if it turns out that when I go back and re-review the evidence of what was paid and what was due and whether anything was due, and it turns out that, in fact, there were – there was a sum that was due for at least one or more of those years, then it seems like that is actually factually correct. Would you agree? I think we haven't established that yet. But, again, that's why you have a hearing. Our proposed trial – But you only have a hearing if you can show evidence or some reason to believe that there was the deliberate holding back of evidence that was relevant here. I know I understand your position that you have that. I'm going to go re-review 304. Well, it's not just 304. If you look at Bruce Eckendorf's declaration, it's an attachment of 304. I think it's 304-1. I believe it's the third or fourth paragraph that Bruce Eckendorf says, I'm providing this declaration because I prepared and paid the taxes. And when I did so, I believe that I extinguished all liability. And then when Chrisley says that there was some potential $3,000 left on 2016, he says he believes that was improperly applied interest for the – essentially, Chrisley paid the taxes. The IRS ignored that they paid it. And they charged penalty and interest at that point. And so the testimony in the declaration was – Well, I mean, that's not exactly accurate, right? I mean, the taxes were due, I guess, under Todd Chrisley's name. They paid it from Julie Chrisley. And there was apparently some kind of – I mean, you're saying it was a coordinated effort. I think – I don't want to make that excuse. I don't think the IRS – I think it was a – the IRS didn't know what they were doing. Left-hand didn't know what the right-hand was doing. In the system, if you had looked and you – and put it in the way that Betty Carter looks, there are – you can see both taxpayers. And you can see that there's a large sum sitting for Todd Chrisley that has not been applied to the joint return with Julie Chrisley. If she had looked at that, she would have seen that those two would have extinguished each other. And if the IRS had properly applied it, they would not then be what Betty Carter says there would be interest and penalties. She would know those interest and penalties would not be due because that payment was made years before with respect to that payment. All right. Thank you very much. And you've reserved your time for rebuttal. We'll hear next from Mr. Samuel. May it please the Court. My name is Dr. Samuel. I represent Peter Tarantino, who was the CPA for both Todd and Julie Chrisley. We have raised one issue on appeal other than adopting the radio arguments of our colleague here. The issue we are raising is whether the trial court erred in refusing to sever the defendants in light of the prejudice that was suffered by Peter Tarantino, the CPA, from being jointly tried with his clients, Chrisleys. The scope of the charges against the co-defendants dwarfed the evidence that was presented against Peter Tarantino. He suffered prejudice not just from the quantity of evidence that was presented against the co-defendants, but also the quality of evidence. He was prejudiced by the fact of their vast wealth, of their prior crimes committed, bank fraud, mail fraud, wire fraud, by their failure to pay taxes for years prior to the time that Peter Tarantino was hired to represent them as their CPA. Their ostentatious wealth, the way they spent money, all of that spilled over to affect Peter Tarantino's defense. Most important, the unique feature of this case is we are not just talking about two defendants who were jointly trialed in the customary case to drug defendants or whatever. We are talking about someone who was the representative, the equivalent of being like a lawyer, being charged with his client because of what the lawyer did to defend his client. As the CPA, he did not have a duty to ensure that all taxes were paid. He did not have a duty to ensure . . . And we are not arguing the sufficiency of the evidence in this case. We are talking about the problem inherent in prosecuting a CPA who, in fact, is doing what he can to minimize his client's taxes, who, in fact, is doing what he can not to facilitate the collection of taxes. But, I mean, you are not arguing for a rule where you can't try the CPA along with the client in a tax evasion scheme? I would never say that you could never do it, but the court was seen to not be careful enough to ensure that the spillover effect from the misdeeds of the client weren't prejudicing their lawyer. Was there any instruction that you requested that you weren't given with respect to that? Our trial counsel did not ask for specific instruction that said, you know, steer clear. There were instructions, of course, as the government points out, that says every defendant has to be tried on his own merit and based on the evidence presented against that defendant. So the typical pattern instruction with regard to that. But there wasn't a specific instruction either requested or given that talked about the duty of a CPA. And I compare the case in our brief to the Kelly decision where the same thing happened. The lawyer was prosecuted along with his client and this court held that it was prejudicial error to do that. In fact, in that case, there was insufficient evidence, but the problem was the same. The problem was, you know, the inability of a jury to distinguish what the role of the expert is who is not, in fact, you know, complicit in the crime committed by his client and yet is facilitating the misconduct of the client by virtue of his professional responsibilities. And the one example which we cite in our brief is the changing of the corporate structure. He told the Chrisleys that the IRS was, you know, wanting to know about the payments made from 7Cs, the bank accounts, and they quickly changed all of the records, changed the bank account, changed the corporate structure. But in doing that, he also told the Chrisleys that he hadn't really been straight with the IRS about what that structure was, didn't he? No. But he, with the technical, and of course, it's okay. What he said was he wasn't, he didn't provide all the information that they requested, but he wasn't deceptive. But that's typical. Lawyers do the same thing. CPAs do the same thing. He didn't. Well, didn't he, sorry, didn't he say something about it being in the daughter's name? Different than the corporate structure. Okay. But that was not accurate, right? There's sufficient evidence on many fronts. I'm not denying it. I understand. Okay. All right. Thank you very much. All right. We'll hear next from Ms. Peters. Good morning, and may it please the Court. I'm Annalise Peters. I represent the United States, and I was trial counsel in this case. The district court did not abuse its discretion in declining to hold a hearing on the defendant's Giglio claim for four reasons. I'm sorry to interrupt, but let me just get right down to the facts. Yes, ma'am. Your friend on the other side of the aisle says that there is evidence that shows that the prosecution, the prosecutors collaborated with the agent, the testifying agent, to effectively tell her to refer only to the transcript as opposed to the actual, as opposed to anything else. And so therefore, not to credit the idea that all of the taxes had been paid. First question is, had all of the taxes been paid as of the time of her testimony? Second question, well, let me have you answer that first. Yes, Your Honor. At the time of her testimony, no. Not all of the taxes had been paid. What had not been paid? A tax so in doing for the years 2010, 2011, and 2016. And that's clear from both Second Dwarf's affidavit submitted by the Chrisley defendants, as well as from Officer Carter's affidavit submitted after the fact. Because four months after trial was over, in September 22, the Chrisley defendants wrote a series of checks to the IRS to pay off their outstanding debts for those three years. So at the time of trial, when Officer Carter testified on redirect examination in response to AUSA CREP's question, do the Chrisley's still owe anything? Officer Carter's answer of, yes, they still owe, was true. Okay, second question. Did the government in any way suggest to the agent that she should review only the transcript as opposed to anything else? Of course, Your Honor. And there's no evidence whatsoever in the record suggesting or even hinting that the government coached this witness to lie or suggested that she should testify inaccurately as to what the Chrisley's owed at the time of trial for the tax years 2014 and 2015. The way that this testimony came up at trial completely undermines the idea that the government would have coached this witness. We never asked Officer Carter about what was due at the time of trial. The purpose of us calling her at trial was only for her to testify about what efforts she had undertaken as a 40-year civil servant during the year that she was assigned to collect the Chrisley's taxes. And that ended in 2017. That's what she testified about on direct, were her actions to try to collect specifically Todd Chrisley's 2009 delinquent taxes owed from years before. It was on cross-examination, as you pointed out, Judge Rosenbaum, that the defendants first brought up this idea of, well, what's due right now? What's due remaining as of the time of trial? And Officer Carter hedged over and over in response to this grilling cross-examination of, I don't recall, I don't have a schedule of payments in front of me. I got off the case in 2017. I'm not personally aware of any payments they made after 2017. And yet, defense counsel marched her through year by year, from the years 2009 to 2016, asking her whether or not the Chrisley's still owed the IRS as of the time of trial, years after the conspiracy. Counsel worked a lot of the questions. Put to Carter, ask her in effect what records show. She's testifying to what records show. I mean, basically, her testimony was subjected to the best evidence rule. When you're testifying about a bunch of records, and you're just verbalizing summaries or whatever, drawing conclusions, the best evidence rule says you've got to put the documents in. Then you can cross-examine the witness with the documents. Was there any objection under the best evidence rule? There was none, Your Honor, and I've got two responses to that. First, Officer Carter accurately testified, and despite her saying, I can't recall, I can't recall, she did accurately recall and testify to what she had reviewed in the EUP system, about what was due and owing for those eight tax years, and some of the years there was no due and owing. Secondly, the audit records and the IRS records that the government admitted at trial had been produced to defense counsel two months before trial. It turns out that some of those records did not accurately reflect some of the payments that the Chrisley's had made long after the conspiracy ended on these delinquent payments. But the Chrisley's never raised that issue. They never objected to the admission of the records. And in fact, this brings me to my second point, the government did not become aware of the fact that Officer Carter's testimony was inaccurate about those two tax years until after trial was over, when the defendants filed their Rule 33 motion. Of course, the defense knew that all along, didn't they? They knew what was due or not had been paid. They certainly knew what payments they had made. Of course, because they had made the payments. The prosecution team was unaware of that. We first learned, the prosecution team first learned about some of these delinquent tax payments two weeks after Officer Carter finished testifying, four days after the government had rested its case in chief, when on the eve of the defense beginning to put up their case, they produced to us a series of records and documents that they intended to admit as exhibits. One of those was a schedule of payments showing that since the conspiracy ended in 2018, the Chrisley's had paid about $2 million towards their delinquent taxes. The prosecution team looked at that and said, huh, we didn't know about any of these. Nobody told us. The IRS civil side had not made us aware, which is why Agent Kinsler, the IRS criminal investigative agent, reached out to Officer Carter, who went into the system and saw and reported back to us nothing about what was due and owing for any years, only that there was a $500,000 payment towards the 2016 tax year that remained uncredited to Todd Chrisley. That was the extent of what we found out during trial. And we didn't disclose that to the Chrisleys, because the Chrisleys, of course, were the ones who made us aware of the payment. That information was in their knowledge. And they went on, and this goes to the third point of materiality. This could not, as Judge Rosenbaum pointed out, this could not have impacted the jury's determination ultimately in reaching their verdict of guilty, because ultimately the Chrisleys presented, through two witnesses, two of their own witnesses, and through documentary evidence, that they made $2 million in post-conspiracy period payments towards the IRS. They had two witnesses. And you didn't, did you challenge that at all? Not once, Judge Rosenbaum. In fact, we never cross-examined them about it. In closing, what did you say about it? In closing, my colleague, AUSA, Mr. Krep got up, and he said, you've heard that the Chrisleys have paid their debts. You've heard that they paid the IRS back. He then went on to basically conceding, you've heard it, they've paid it all back. He then went on to argue, but that doesn't matter, because you can't unrob the bank. You can't pay back the money and undo the crime. And that was consistent with the jury instruction that the district court gave, which is that evidence of delinquent payments was allowed in at trial, and the jury could consider those, but later actions do not nullify the crime. And here, the evidence was overwhelming at trial that the Chrisleys had taken a number of steps to evade the IRS, and they conspired to evade the IRS. And so, whether or not any taxes were due and owing at the time of trial was immaterial to any element of any charge in this case. And in any event, as you started out by asking Judge Rosenbaum, the Chrisley defendants did owe taxes as of the time of trial. I'd like to just briefly note on the hearing front again. Let me ask you something. So, if we go back and we look at the record, and we conclude that the facts are as your friend across the aisle has described them, then let me just ask you, was it error for the district court not to hold an evidentiary hearing? It wasn't, Your Honor. And why is that? Because it was immaterial. It could not have impacted the jury's verdict. And that's because taxes were due and owing, and even if they had been fully paid, which they weren't, the jury heard that evidence from two defense witnesses. And you didn't rely on it. We never relied on it. We never brought it up again in submission. In fact, in closing, we conceded and told the jury, you've heard that the Chrisleys have paid back their debt. And defense counsel argued the same thing. He argued in closing, you've heard that, in fact, the IRS owes the Chrisley defendants money back. On the other hand, if there were evidence that there was an active fraud that was perpetrated on the court by the prosecution and the agent, you would agree that it would be appropriate for the court to hold a hearing on that? Yes, Your Honor, of course. And the cases where an evidentiary hearing has been granted post-trial are wildly different from the facts and circumstances in this case. In, for instance, the Guzman case, which was a habeas case based on a post-conviction where the defendant was sentenced to death after a murder, the evidence that warranted a hearing there was that both the lead case agent and the government's key witness had lied at trial about the fact that the key witness had received a $500 payment in sort of an exchange for her testimony. Here, Officer Carter was not a case agent. She was not part of the prosecution team. She was one of four IRS civil employees who testified at trial for less than a day among dozens and dozens of witnesses. And certainly, the defense has come up with no credible allegations other than a few innocuous affidavits saying that the government met with Officer Carter to prepare her for her testimony, as we do in every case, and that a number of IRS employees, including Officer Carter, looked at a bunch of numerous experiments. The other case is the Hernandez-Espinoza-Hernandez case. And again, the allegations there after trial that warranted her hearing were a far cry from what we have here. And that case... The agent was under investigation for drug activity, right? And it was a drug activity-related case. ...from prison and had lied during their job application about prior drug activity in a drug case. So a far, far cry from what we have here. So yes, if there are credible allegations and some evidence proffered about any sort of government misconduct, a hearing should be had, and that's simply not what we have in this case. So for all of those reasons, Your Honor, the District Court did not abuse its discretion in declining to hold a hearing on the Giglio claim. And in fact, the District Court tried to shut down these meritless allegations on numerous occasions and noted in her 78-page order on the motion for reconsideration that the defendants filed that she was, again, surprised that they had raised these allegations without any evidence behind them. Turning briefly to the Court's decision to deny Defendant Tarantino's motion for severance, there was no abuse of discretion by the Court on that point. What about the fact that both of the Chrisleys the Court found, I guess, had been involved in some kind of obstruction? Did that in any way... Mr. Tarantino, since I don't think there was a similar situation there? It was not, Your Honor. As my colleague acknowledged, the Court did give a limiting instruction in this case, and all of the record shows that the jury, in fact, was able to follow the Court's instructions and consider the evidence as to each defendant. The jury deliberated for nearly three days. They came back and asked multiple questions that indicated that they were, in fact, considering the evidence as to each defendant. One of the questions they asked was whether they could review a certain piece of evidence that related specifically to Defendant Tarantino. Overall, it showed that they considered the evidence as to each defendant. And this case is very unlike the Pedrick case that defendants have relied on. That was the only Eleventh Circuit case that has been cited where it was found that a co-conspirator should be severed off from his co-defendants to be tried separately for the same conspiracy. And that case is, again, a far cry from what this one is. In Pedrick, one of the defendants was convicted with his co-defendant of a conspiracy, but then in addition convicted of about 80 counts of submitting false billing things to the United States government. And in that case, the jury deliberated for only three hours and there was no evidence at all that Pedrick, that defendant, had ever been involved in even submitting anything to the court. By contrast here, Tarantino was only convicted of the three crimes that he was specifically involved in. He was a part of the conspiracy period with the Chrisleys to obstruct the IRS. And then he personally submitted the two blank and misleading IRS Form 1120-S's to the IRS that he was convicted of. He made numerous misdemeanors. He provided misleading information to the IRS. He told numerous lies to the IRS, to three or four different revenue officers who were all involved in this.  And the presumption, of course, is that co-conspirators should be tried together and the defendant has not met his burden of showing any actual compelling prejudice that resulted from this. Thank you, counsel. Thank you very much. All right, we'll hear again from Mr. Little. Your Honor, this argument shows why you have hearings and why you have district courts. What the government just told you isn't true. It's not in the record. I can't cross-examine her, but that's what the district court can let me do. Well, let me ask you something. You have, I asked you before about what evidence you rely on to show that there was some kind of conspiracy between the prosecution and the agent to have her testify to something that they knew was misleading. And you said, well, look at page 304 and the declaration. But you didn't tell me specifically what you're relying on there. Can you be a little bit more specific? In our brief, in the reply brief, if we walk through specific knowledge and we relate it back to the affidavits as to what they knew and when they know it. Do you have anything more than that, though? Because I will tell you that when I reviewed that, that seemed to me like just pure speculation. Your Honor, page 292 is their response to the court in the new trial. Sorry, docket 292 is their response to the new trial motion. And in that response, they say, and I believe it's page like 17 or 18, they say, well, the prosecution team relied on the EUP in sort of preparing its case and putting on its case. They also acknowledge later the EUP was mistaken. And so if they both know the EUP is mistaken and they know that they've relied upon it, I think that's the prima facie evidence. But they had to have known that it was mistaken at the time. I mean, the fact that they later figure out that it's mistaken doesn't tell us anything about their ill will at the time they relied upon it. And the only reason this court or the district court thinks they didn't know back then is because there's a presumption that the government is telling the truth. There is nothing in the records... But what stopped you from cross-examining? No, I'm serious. Demanding the production of the records on which the witness is basing her testimony. A lot of her testimony, you'll agree, was based on records. Documents. All subject to the best evidence rule. Produce all the documents on which you're going to testify. Then she had some other testimony about things she did as a revenue agent which are not documented, basically. But a recess could have been asked for by the court and have the government produce the documents on which she's making the testimony. I think that the... In 771 to page 775 of day 3, volume 3 of the testimony, when Bruce Morris asks these questions of the witness, he's not asking just about documents. He's asking her what her knowledge is of what his client... I know, but her knowledge of whether something's been paid is based on document. Yes, and our affidavit... All of it's based on document. And the Cox affidavit shows that the IRS audit trail that Ms. Carter looked at would have shown her that those payments would have extinguished any liability. So those documents, the defense did not have at the time of trial. We didn't get it until the three days after... I know the defense didn't have, but what I'm saying is a sidebar conference with the judge raising the problem. You've got a recess. Straighten the situation out. That's the way it used to be done. And wouldn't it need to be happened if she had testified truthfully about the extent of her knowledge? And I want to point that out because they say here, again, at the 2016 is still owing. In the trial, the testimony specifically of Bruce Secondore at trial, at PID 3048-49 is the IRS owes them a couple thousand dollars minimum. They're definitely overpaid for 2016 and prior. He also said that in his declaration, and I mistake the number. It wasn't 304, it was 258-1. It's in the eighth paragraph of 258-1. That same representation. According to the accountant who saw these payments, who saw the amount due, there was nothing due at the time of trial. So I think the record needs to be completed because the only thing we have is the competencies.